No. 25-1140

In the

# United States Court of Appeals
## for the Sixth Circuit

KUSHAWN MILES-EL,

*Plaintiff-Appellant,*

v.

MICHIGAN, *et al.*,

*Defendant-Appellee.*

On Appeal from the United States District Court for the
Western District of Michigan, Case No. 2:23-cv-31,
Hon. Jane M. Beckering, *United States District Judge*

## PLAINTIFF-APPELLANT KUSHAWN S. MILES-EL'S OPENING BRIEF

Samuel Weiss
RIGHTS BEHIND BARS
1800 M. St. NW
Fnt. 1 Suite 33921
Washington, DC 20033

Shay Dvoretzky
Parker Rider-Longmaid
Steven D. Marcus
 *Counsel of Record*
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
steven.marcus@skadden.com

*Counsel for Plaintiff-Appellant Kushawn S. Miles-El*

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 25-1140          Case Name: Kushawn Miles-El v. Michigan et al.

Name of counsel: Steven Marcus

Pursuant to 6th Cir. R. 26.1, Kushawn Miles-El
*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the
     identity of the parent corporation or affiliate and the relationship between it and the named
     party:

No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
     in the outcome? If yes, list the identity of such corporation and the nature of the financial
     interest:

No.

## CERTIFICATE OF SERVICE

I certify that on _____ August 5, 2025 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Steven Marcus

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a) **Parties Required to Make Disclosure**. With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement. A negative report is required except in the case of individual criminal defendants.

(b) **Financial Interest to Be Disclosed**.

(1) Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal. A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c) **Form and Time of Disclosure**. The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# TABLE OF CONTENTS

DISCLOSURES OF CORPORATE AFFILIATION AND FINANCIAL
INTEREST ................................................................................... ii

TABLE OF AUTHORITIES ................................................................. vi

STATEMENT IN SUPPORT OF ORAL ARGUMENT .................... xiv

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ....................................................... 8

STATEMENT OF ISSUES ..................................................................... 8

STATEMENT OF THE CASE ............................................................... 10

    A.    Factual and procedural background ............................ 10

        1.    MDOC houses Mr. Miles-El in prisons where he is
exposed to dogs, triggering his severe asthma and
ultimately leading to a mental health breakdown. ........... 10

        2.    Mr. Miles-El's severe asthma, and MDOC's failure
to accommodate his disability, prevents him from
accessing services, programs, and benefits. ....................... 14

        3.    MDOC officials were aware of, but failed to
accommodate, Mr. Miles-El's disability. ........................... 15

        4.    Mr. Miles-El files suit in the Western District of
Michigan. ............................................................................ 18

        5.    The district court grants summary judgment to the
defendants. ........................................................................... 19

STANDARD OF REVIEW ................................................................... 20

SUMMARY OF ARGUMENT ............................................................. 21

ARGUMENT...................................................................................28

I.     The summary judgment record established disputes of material
       fact on Mr. Miles's RA and ADA claims. ................................28

       A.    The RA and the ADA establish two theories for plaintiffs
             to recover—failure to accommodate and intentional
             discrimination. ..................................................................29

             1.    The RA and the ADA establish broad protections
                   for prisoners with disabilities................................29

             2.    The RA and ADA provide two causes of action for
                   plaintiffs..................................................................32

                   a.    A plaintiff makes out a claim under the RA
                         and ADA if the defendant fails to
                         accommodate his disability.......................34

                   b.    A plaintiff makes out a claim under the RA
                         and ADA if the defendant discriminates on
                         the basis of disability.................................36

       B.    The record contains disputes of material fact on both
             theories. ...........................................................................38

             1.    Mr. Miles-El met his burden to show that
                   defendants failed to reasonably accommodate his
                   disability. ................................................................38

             2.    Mr. Miles-El met his burden to show that
                   defendants intentionally discriminated against him
                   because of his disability. .......................................44

       C.    The district court's contrary reasoning was wrong. ...................45

a.  Mr. Miles-El alleged, and proffered evidence, that he was denied several services and programs. ....................................................46

b.  The district court wrongly analyzed Mr. Miles-El's claims. ........................................47

II.  The summary judgment record established disputes of material fact on Mr. Miles-El's Eighth Amendment claims................................49

A.  The Eighth Amendment's prohibition against cruel and unusual punishment includes an objective and subjective component. .........................................................50

B.  Mr. Miles-El met his burden at summary judgment. .................52

C.  The district court erred in granting summary judgment to Officer Pancheri. .................................................54

D.  Officer Pancheri isn't entitled to qualified immunity.................56

III.  The Eleventh Amendment does not bar Mr. Miles-El's claims. ..........59

A.  Sovereign immunity doesn't bar any claims under the RA and it doesn't bar ADA claims that sound in constitutional violations. .................................................60

B.  Michigan waived sovereign immunity for RA claims when it accepted federal funds. ......................................63

C.  Sovereign immunity doesn't bar Mr. Miles's ADA claims. .......63

IV.  The Court should reverse the district court's decision not to exercise supplemental jurisdiction over Mr. Miles-El's state-law claims. .........................................................64

CONCLUSION .........................................................65

# TABLE OF CONTENTS
## (continued)

Page

CERTIFICATE OF COMPLIANCE .................................................................66

CERTIFICATE OF SERVICE ..........................................................................67

ADDENDUM......................................................................................Add.1

# TABLE OF AUTHORITIES

**PAGE(S)**

CASES

*Albert v. Smith's Food & Drug Centers, Inc.,*
356 F.3d 1242 (10th Cir. 2004) ........................................................39

*Alexander v. Choate,*
469 U.S. 287 (1985) ................................................................ 29, 30

*Alphonsis v. Garnica,*
No. 21-56141, 2022 WL 7842130
(9th Cir. Oct. 14, 2022) ............................................... 41, 42

*Anderson v. City of Blue Ash,*
798 F.3d 338 (6th Cir. 2015) ........................................................37

*Arrington-Bey v. City of Bedford Heights, Ohio,*
858 F.3d 988 (6th Cir. 2017) ........................................................57

*Ashford v. University of Michigan,*
89 F.4th 960 (6th Cir. 2024) ........................................................60

*Bennett v. Hurley Medical Center,*
86 F.4th 314 (6th Cir. 2023) ................................................. 37, 38

*Blackmore v. Kalamazoo County,*
390 F.3d 890 (6th Cir. 2004) ........................................................52

*Boswell v. Mayer,*
169 F.3d 384 (6th Cir. 1999) ........................................................21

*Brown v. Meisner,*
81 F.4th 706 (7th Cir. 2023) ............................................ 2, 3, 48

*Burton v. McDonald,*
No. 2:11-CV-2187, 2012 WL 2912432
(E.D. Cal. July 16, 2012) ........................................................43

*Butler v. Scholten*, 1:19-CV-449, 2019 WL 4126470
(W.D. Mich. Aug. 30, 2019) ........................................................47

*Cassidy v. Detroit Edison Co.,*
   138 F.3d 629 (6th Cir. 1998) ....................................................43

*Chapman v. Franklin County Sheriff,* 2:22-CV-2524, 2022 WL 3359283
   (S.D. Ohio Aug. 15, 2022) ......................................................47

*Childress v. Fox Associates, LLC,*
   932 F.3d 1165 (8th Cir. 2019) ......................................... 35, 36

*City of Boerne v. Flores,*
   521 U.S. 507 (1997) ................................................................62

*Coulson v. Goodyear Tire & Rubber Co.,*
   31 F. App'x 851 (6th Cir. 2002) ............................................36

*Darrah v. Krisher,*
   865 F.3d 361 (6th Cir. 2017) ........................................... 57, 58

*Dinkins v. Correctional Medical Services,*
   743 F.3d 633 (8th Cir. 2014) ........................................... 61, 62

*Disabled in Action v. Board of Elections in City of New York,*
   752 F.3d 189 (2d Cir. 2014) ...................................................34

*Douglas v. Muzzin,*
   No. 21-2801, 2022 WL 3088240
   (6th Cir. Aug. 3, 2022) ...........................................................41

*Durham v. Kelley,*
   82 F.4th 217 (3d Cir. 2023) ......................................... 61, 62, 63

*EEOC v. United Parcel Service, Inc.,*
   249 F.3d 557 (6th Cir. 2001) ..................................................43

*Estelle v. Gamble,*
   429 U.S. 97 (1976) ......................................................... 57, 58, 59

*Eustace v. Springfield Public Schools,*
   463 F. Supp. 3d 87 (D. Mass. 2020) ......................................43

*Farmer v. Brennan,*
   511 U.S. 825 (1994) ....................................................... 50, 57, 59

*Finley v. Huss,*
102 F.4th 789 (6th Cir. 2024) .................................. 2, 4, 6, 7, 22, 28, 31, 32, 34,
........................................................ 35, 36, 37, 43, 51, 56, 57, 59, 61, 63

*Furgess v. Pennsylvania Department of Corrections,*
933 F.3d 285 (3d Cir. 2019) ................................................. 40, 41, 48

*Gean v. Hattaway,*
330 F.3d 758 (6th Cir. 2003) ...............................................................60

*Golden v. Illinois Department of Corrections,*
No. 12-CV-7743, 2016 WL 5373056
(N.D. Ill. Sept. 26, 2016) ......................................................................43

*Harrison v. Ash,*
539 F.3d 510 (6th Cir. 2008) ........................................................ 52, 53

*Hedrick v. Western Reserve Care System,*
355 F.3d 444 (6th Cir. 2004) ...............................................................36

*Helling v. McKinney,*
509 U.S. 25 (1993) ........................................................................ 58, 59

*Hernandez v. County of Monterey,*
110 F. Supp. 3d 929 (N.D. Cal. 2015) .............................................39

*Holmes v. Godinez,*
311 F.R.D. 177 (N.D. Ill. 2015) ..........................................................39

*Hunt v. Reynolds,*
974 F.2d 734 (6th Cir. 1992) ...................................................... 27, 58, 59

*Ingram v. Clements,*
705 F. App'x 721 (10th Cir. 2017) ....................................................48

*Jackson v. VHS Detroit Receiving Hospital, Inc.,*
814 F.3d 769 (6th Cir. 2016) ..............................................................21

*Jaros v. Illinois Department of Corrections,*
684 F.3d 667 (7th Cir. 2012) ..............................................................41

# TABLE OF AUTHORITIES
## (continued)

*Johnson v. City of Saline*,
　151 F.3d 564 (6th Cir. 1998) ...................................................... 23, 33

*Jones v. Centurion*,
　No. 1:22-CV-24, 2022 WL 9495987
　(M.D. Tenn. Oct. 14, 2022) ..............................................................43

*Keller v. Chippewa County, Michigan Board of Commissioners*,
　860 F. App'x 381 (6th Cir. 2021) ...................................................34

*Kirilenko-Ison v. Board of Education of Danville Independent Schools*,
　974 F.3d 652 (6th Cir. 2020) .............................................................21

*Kleiber v. Honda of America Manufacturing, Inc.*,
　485 F.3d 862 (6th Cir. 2007) ...................................................... 36, 37

*Levesque v. Clinton County*,
　No. 9:10-CV-0787, 2012 WL 6948779
　(N.D.N.Y. Dec. 28, 2012) .......................................................... 40, 41

*Lonergan v. Florida Department of Corrections*,
　623 F. App'x 990 (11th Cir. 2015) ..................................................43

*Luna v. Davis*,
　59 F.4th 713 (5th Cir. 2023) .............................................................51

*McDaniel v. Syed*,
　115 F.4th 805 (7th Cir. 2024) ..........................................................61

*McDonnell Douglas Corp. v. Green*,
　411 U.S. 792 (1973) ........................................................ 23, 24, 37, 44

*McKenzie v. Department of Corrections*,
　957 N.W.2d 341 (Mich. Ct. App. 2020) ..........................................63

*McPherson v. Michigan High School Athletic Ass'n*,
　119 F.3d 453 (6th Cir. 1997) ...........................................................36

*Miller v. King*,
　384 F.3d 1248 (11th Cir. 2004) ................................................. 33, 43

*Monette v. Electronic Data Systems Corp.*,
90 F.3d 1173 (6th Cir. 1996) ................................................................45

*Munoz v. California Department of Corrections and Rehabilitation*,
842 F. App'x 59 (9th Cir. 2021) .........................................................48

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999) ...............................................................................29

*Pennsylvania Department of Corrections v. Yeskey*,
524 U.S. 206 (1998) ........................................................ 31, 32, 33, 46

*PGA Tour, Inc. v. Martin*,
532 U.S. 661 (2001) ......................................................................... 30, 31

*Public Interest Legal Foundation v. Benson*,
136 F.4th 613 (6th Cir. 2025) ..............................................................20

*Purcell v. Pennsylvania Department of Corrections*,
No. 3:00-CV-181, 2006 WL 891449 (W.D. Pa. 2006) ....................43

*Rhodes v. Michigan*,
10 F.4th 665 (6th Cir. 2021) ...............................................................57

*Roell v. Hamilton County, Ohio/Hamilton County Board of County
Commissioners*,
870 F.3d 471 (6th Cir. 2017) ...............................................................34

*S.S. v. Eastern Kentucky University*,
532 F.3d 445 (6th Cir. 2008) ...........................................................3, 4

*See v. City of Elyria*,
502 F.3d 484 (6th Cir. 2007) ...............................................................21

*Smothers v. Solvay Chemicals, Inc.*,
740 F.3d 530 (10th Cir. 2014) ...................................................... 39, 42

*Stein v. HHGREGG, Inc.*,
873 F.3d 523 (6th Cir. 2017) ...............................................................65

*Stevenson v. Pramstaller*,
No. 2:08-CV-79, 2009 WL 1883878 (W.D. Mich. June 30, 2009) .................47

# TABLE OF AUTHORITIES

(continued)

*Talal v. White*,
  403 F.3d 423 (6th Cir. 2005) ........................................................58

*Tchankpa v. Ascena Retail Group, Inc.*,
  951 F.3d 805 (6th Cir. 2020) ........................................................36

*Tennessee v. Lane*,
  541 U.S. 509 (2004) ........................................................ 62, 63, 64

*United States v. Georgia*,
  546 U.S. 151 (2006) ................................. 7, 28, 33, 34, 35, 40, 41, 46, 59, 61, 62

*Valentine v. Collier*,
  993 F.3d 270 (5th Cir. 2021) ..................................................... 61, 62

*Warren v. Vincent*,
  No. 3:08-CV-250, 2012 WL 566650
  (W.D. Pa. Feb. 21, 2012) ..............................................................43

*Wilson v. Williams*,
  961 F.3d 829 (6th Cir. 2020) ..................................................... 50, 51

*Wright v. New York State Department of Corrections*,
  831 F.3d 64 (2d Cir. 2016) ............................................................39

## CONSTITUTION AND STATUTES

U.S. Const. amend. I ................................................................... 18, 19

U.S. Const. amend. VI................................................................. 62, 63

U.S. Const. amend. VIII.......................................xii, 2, 6, 7, 9, 18, 19, 21, 26, 28
  ................................................. 49, 50, 56, 57, 58, 59, 60, 61, 63, 64, 65

U.S. Const. amend. XI....................................................................27

U.S. Const. amend. XIV ................................................................62
  U.S. Const. amend. XIV § 1 ...................................................... 62, 63
  U.S. Const. amend. XIV § 5........................................................ 61, 62, 64

28 U.S.C. § 1291............................................................................8

28 U.S.C. § 1331............................................................................8

28 U.S.C. § 1367.................................................................................8

Rehabilitation Act of 1973
    29 U.S.C. § 701 *et seq.*....................................xiv, 2, 3, 4, 5, 6, 7, 8, 9,
    .......................................................... 18, 19, 20, 21, 22, 25, 28, 29, 30,
    ................................... 31, 33, 34, 35, 36, 46, 47, 48, 59, 60, 65
    29 U.S.C. § 701.................................................................................2
    29 U.S.C. § 794.......................................................................... 3, 34, 35
    29 U.S.C. § 794(a) ............................................................................30

Civil Rights Act of 1964
    42 U.S.C. § 2000d-7 .............................................................. 27, 28, 60

Americans with Disabilities Act of 1990
    42 U.S.C. § 12101 *et seq.*...........................................xiv, 2, 3, 4, 5, 6, 7, 8, 9, 18,
    ............................................................. 19, 20, 21, 22, 25, 26, 28, 29, 30, 31
    ......................................... 33, 34, 35, 36, 46, 47, 48, 49, 59, 60, 61, 62, 63, 64, 65
    42 U.S.C. § 12101...............................................................................2
    42 U.S.C. § 12101(a)(2) ....................................................................30
    42 U.S.C. § 12102(1)(A) .......................................................... 23, 32, 39
    42 U.S.C. § 12102(4)(A), (4)(E)(i) .......................................................30
    42 U.S.C. § 12102(4)(D) ...................................................................32
    42 U.S.C. § 12111.......................................................................... 30, 31
    42 U.S.C. § 12111(2) ........................................................................30
    42 U.S.C. § 12131(1) ........................................................................30
    42 U.S.C. § 12131(1)(B) ...................................................................32
    42 U.S.C. § 12132...............................3, 27, 28, 30, 31, 33, 34, 35, 60, 61, 62, 64
    42 U.S.C. § 12181.......................................................................... 30, 31
    42 U.S.C. § 12202...............................................................................61

Mich. Const. ....................................................................................64

Mich. Const. art. I ........................................................................ 18, 19

Michigan Persons with Disabilities Civil Rights Act
    Mich. Act 220 of 1976 § 37.1101 *et seq.*................................ 18, 19, 64

**Page(s)**

RULES AND REGULATIONS

Fed. R. Civ. P. 56(a) ......................................................................... 21, 21

28 C.F.R. § 41.32(b) ................................................................................33

28 C.F.R. § 35.130(b)(7) ..................................................................... 35, 36

28 C.F.R. § 35.130(b)(7)(i) ....................................................................4, 5

28 C.F.R. § 35.150(a)(3) ........................................................... 4, 5, 35, 36

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This appeal presents a complex and important question about the failure to accommodate theory of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA), including drawing the boundaries between a permissible failure-to-accommodate claim and an impermissible inadequate medical treatment claim. This case also presents a question about the scope of qualified immunity in the Eighth Amendment context, and an Eleventh Amendment state sovereignty question about the RA and ADA.

Counsel for Mr. Miles-El submits that oral argument will assist the Court in deciding these issues.

# INTRODUCTION

Kushawn Miles-El is a prisoner in the custody of the Michigan Department of Corrections (MDOC). Prison healthcare providers diagnosed Mr. Miles-El with severe asthma, triggered by exposure to dogs. Nevertheless, for years, MDOC incarcerated Mr. Miles-El in housing units where he was constantly exposed to dogs. He suffered repeated serious asthma attacks and had difficulty breathing—symptoms that limited his ability to participate in prison programming, to access prison medical care, and to eat in the dining hall. Mr. Miles-El consistently and forcefully requested that MDOC transfer him to a prison where he wouldn't be exposed to dogs. But MDOC refused to accommodate Mr. Miles-El's disability. Instead, MDOC repeatedly transferred Mr. Miles-El to housing units where he was forced to live in close proximity to dogs. MDOC forced Mr. Miles-El to suffer severe asthma attacks for years, ultimately leading to a mental health breakdown and resulting in Mr. Miles-El placement in a mental health program to treat depression and anxiety.

So Mr. Miles-El sued MDOC and other state entities (collectively referred to as "MDOC" here), and individual officers responsible for

transferring Mr. Miles-El to these facilities. He alleged violations of Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701 *et seq.*, and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, two broad remedial statutes that ensure equal opportunity for people with disabilities to access government programs, benefits, and services. And he alleged that individual officers violated the Eighth Amendment through their deliberate indifference to his severe asthma.

At summary judgment, he produced evidence demonstrating that he suffered from a disability, that the defendants failed to reasonably accommodate that disability, and that, as a result, he was unable to benefit from programs and services. And he showed that prison officials were deliberately indifferent to his suffering, because they knew about his disability but nonetheless kept him in facilities where he would be exposed to dogs.

Despite this evidence, the district court granted summary judgment to the state entities and to the individual officers. In so doing, the district court mischaracterized Mr. Miles-El's RA and ADA failure-to-accommodate claims, which are well-established theories, *see Finley v. Huss*, 102 F.4th 789, 820 (6th Cir. 2024), as an inadequate medical treatment claim. That was

wrong, and this Court should join other circuits that have reversed district courts for making the same mistake. *See, e.g.*, *Brown v. Meisner*, 81 F.4th 706, 709 (7th Cir. 2023). The court also erred by disregarding Mr. Miles-El's evidence that MDOC's failure to accommodate his disability prohibited him from accessing prison services, including food, medicine, clothing, and programming. And the court's grant of summary judgment on the Eighth Amendment claim was wrong, too, because the record contained a key dispute of material fact as to whether Officer Pancheri had the authority to transfer him to a different prison.

The Court should reverse.

**1.** A jury should decide Mr. Miles-El's RA and ADA claims. Those statutes require that no "qualified individual with a disability" be denied the benefits of the services, programs, or activities of a public entity because of their disability. 42 U.S.C. § 12132; 29 U.S.C. § 794. The RA and ADA, which are coextensive save for differences not dispositive here, require a plaintiff to allege, and ultimately prove, that they have a disability, that they are otherwise qualified for the service, program, or activity, and that they were discriminated against because of their disability. *S.S. v. Eastern Kentucky*

*University*, 532 F.3d 445, 452-53 (6th Cir. 2008). A plaintiff can satisfy that last requirement—the discrimination prong—by establishing that the public entity failed to reasonably accommodate their disability *or* by showing differential treatment on the basis of disability. So, courts recognize two different RA/ADA claims: (1) a failure-to-accommodate claim; and (2) an intentional discrimination claim. *Finley*, 102 F.4th at 820. (For the RA, the plaintiff must also show that the defendant received federal funding, and for an intentional discrimination claim that their disability was the sole cause of discrimination.)

Mr. Miles-El brought and met his burden on both claims, much of which MDOC doesn't dispute. He has severe asthma, which all agree is a qualifying disability. And he was denied access to programs, benefits, and services—including medical care, prison programming, the use of computers, and even food—because MDOC, which receives federal funding, failed to accommodate his disability. For his failure-to-accommodate claim, he showed (and MDOC did not dispute) that a facility transfer was a reasonable accommodation—that is, an accommodation that doesn't impose "undue financial and administrative burdens" or "fundamentally alter the nature" of

their services or programs. 28 C.F.R. §§ 35.130(b)(7)(i), 35.150(a)(3). Indeed, MDOC officials recognized that transferring Mr. Miles-El would be the "best solution" to "alleviate [his] dog dander problems," Corr. Recs., R.1-2, PageID.22, but for years they refused to do so. For his intentional discrimination claim, he showed that MDOC transferred other prisoners for a variety of reasons, but didn't transfer him.

The district court granted summary judgment to the state entities on the RA/ADA claims for two reasons, but neither stands up to scrutiny.

*First*, the court reasoned that Mr. Miles-El hadn't shown that he was denied access to services, programs, or benefits. That was error. Mr. Miles-El argued, and showed, that because of his disability, he could not access several services and programs. Take just one example: Prison nurses distributing medicine in Mr. Miles-El's housing unit touched the dogs before handing out medicine, which Mr. Miles-El had to refuse for fear of triggering an asthma attack. Corr. Recs., R.1-2, PageID.22; Corr. Recs., R.1-15, PageID.39. The district court didn't address that service, or any of Mr. Miles-El's other arguments demonstrating that MDOC's failure to accommodate

impeded his access to other recognized services, including food, clothing, and programming.

*Second*, the court mischaracterized Mr. Miles-El's RA/ADA claims as claims about substandard medical care. That was wrong. From complaint through summary judgment, Mr. Miles-El has consistently claimed, and met his burden to show, a failure-to-accommodate claim. The district court improperly transformed that claim (well-established as a viable RA/ADA claim, *see Finley*, 102 F.4th at 820) into one about inadequate medical treatment (which is not a viable RA/ADA claim). That mischaracterization would write the failure-to-accommodate theory out of the RA and ADA. Under the district court's theory, the failure to provide a wheelchair ramp (a paradigmatic accommodation) could be recharacterized as a failure to treat a handicap, rather than a failure to accommodate wheelchair users. That can't be right.

**2.** A jury should also decide Mr. Miles-El's Eighth Amendment claim against Officer Pancheri—the MDOC official who maintained Mr. Miles-El in housing facilities with dogs. Mr. Miles-El showed that his severe

asthma, triggered by exposure to dogs, posed a substantial threat to his health, and that Officer Pancheri was aware of, but disregarded, that risk.

The district court's contrary reasoning was wrong. The court concluded that Officer Pancheri lacked authority to transfer Mr. Miles-El, but Mr. Miles-El vigorously contested that material fact with evidence that Officer Pancheri did have that authority. That's a quintessential dispute of material fact, unacknowledged by the district court, that a jury needs to resolve. And while the district court didn't decide whether Officer Pancheri was entitled to qualified immunity, he's not: It's clearly established that the failure to transfer a prisoner away from a harmful environment is deliberate indifference.

3. The district court also didn't decide whether state sovereign immunity bars Mr. Miles-El's claims for damages, but it doesn't. Michigan has expressly waived its sovereign immunity for RA claims, *see Finley*, 102 F.4th at 819 n.13, and the ADA abrogates sovereign immunity for claims like Mr. Miles-El's that are also violations of the Eighth Amendment, *see United States v. Georgia*, 546 U.S. 151, 157 (2006).

**4.** Finally, the district court declined to exercise supplemental jurisdiction over Mr. Miles-El's state law claims because it granted summary judgment on all the federal claims. If the Court reverses on any of the federal law claims, the district court must consider whether to exercise supplemental jurisdiction.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Mr. Miles-El's action arose under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1367, because Mr. Miles-El asserted related state-law claims.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291, because the district court's order granting summary judgment on all claims was a final decision that disposed of all of Mr. Miles-El's claims.

This appeal is timely. The district court entered final judgment on January 31, 2025, and Mr. Miles-El noticed his appeal on February 13, 2025.

## STATEMENT OF ISSUES

**1.** Whether the Court should reverse the grant of summary judgment on Mr. Miles-El's Americans with Disabilities Act and Rehabilitation

Act claims when Mr. Miles-El showed that he suffered from severe asthma, could not access prison benefits and programs because of his disability, and where the Michigan Department of Corrections failed to reasonably accommodate his disability and treated other prisoners differently.

**2.** Whether the Court should reverse the grant of summary judgment to Officer Pancheri on Mr. Miles-El's Eighth Amendment claim when the summary-judgment record contained a dispute of material fact about whether Officer Pancheri had authority to transfer Mr. Miles-El.

**3.** Whether the state entities are entitled to state sovereign immunity when the Rehabilitation Act explicitly abrogates Michigan's sovereign immunity (because Michigan receives federal funds) when the Americans with Disabilities Act abrogates sovereign immunity for constitutional violations, which Mr. Miles-El also showed.

**4.** Whether the district court should, on remand, reconsider exercising supplemental jurisdiction over Mr. Miles-El's state law claims.

## STATEMENT OF THE CASE

### A.    Factual and procedural background

1.    **MDOC houses Mr. Miles-El in prisons where he is exposed to dogs, triggering his severe asthma and ultimately leading to a mental health breakdown.**

Kushawn Miles-El has been incarcerated in the custody of the Michigan Department of Corrections for over 30 years. First R&R, R.23, PageID.273. For years, MDOC kept Mr. Miles-El in prisons where he was exposed to dogs and suffered severe health problems as a result.

In 2017, Miles-El was transferred to the Muskegon Correctional Facility, an MDOC facility that offers a dog training program. Complaint, R.1, PageID.6. Mr. Miles-El immediately began having severe allergy and asthma attacks because of his exposure to the dogs, and he alerted MDOC officials to his symptoms. *Id.* In January 2017, an MDOC health care provider confirmed that Mr. Miles-El had "severe persistent" asthma that was aggravated by exposure to "animals." Complaint, R.1, PageID.7. Mr. Miles-El's symptoms included severe chest congestion, fatigue, difficulty breathing, and severe asthma attacks. Complaint, R.1, PageID.9.

MDOC transferred Mr. Miles-El from Muskegon to the Brooks Correctional Facility, and then to the Chippewa Correctional Facility. Complaint,

R.1, PageID.7. While there, Mr. Miles-El continued to experience severe asthma attacks triggered by the dogs, because officers "brought dogs to his housing unit" and "walk[ed] around his unit with the dogs." *Id.* Again, Mr. Miles-El informed MDOC officials—including Officer Pancheri, a counselor at Chippewa, of his disability. Pancheri Decl., R.34-4, PageID.365; Miles-El Opp'n to SJ, R.36, PageID.392-393. MDOC officials at Chippewa confirmed: "Miles does have allergies to dogs … He does have asthma and respiratory problems and animal dander is always a mitigating factor for anyone with those problems." Corr. Recs., R.1-2, PageID.22. And MDOC officials admitted that they "witnessed the respiratory and asthma problems that [Mr. Miles-El has] been having." *Id.* MDOC officials transferred Mr. Miles-El from one housing unit at Chippewa to another, but the transfer made no difference: Both units exposed Mr. Miles-El to dogs, triggering his severe allergic reactions. Corr. Recs., R.1-3, PageID.24.

Mr. Miles-El requested a transfer from Chippewa to a prison that did not have dogs at all. *Id.* But MDOC refused to transfer Mr. Miles-El. Officer Pancheri then transferred Mr. Miles-El to *another* MDOC facility where he was guaranteed to be housed with dogs. Complaint, R.1, PageID.8. Mr.

Miles-El told Officer Pancheri that the transfer would trigger his severe asthma, but Officer Pancheri told Mr. Miles-El that he "did not care" and that Mr. Miles-El could "complain and deal with" his asthma there. *Id.*

As Officer Pancheri promised, Mr. Miles-El was transferred to Algers, another MDOC facility with dogs. Mr. Miles-El showed prison officials his medical records, detailing his severe asthma and triggering allergy, but MDOC officers ignored the report and placed him in a housing unit with dogs. *Id.*

As Mr. Miles-El predicted, in February 2020, he suffered severe asthma attacks as a result of his exposure to dogs. *Id.* Mr. Miles-El reported those attacks to MDOC staff, including "unit officers, prison[] counselors, warden, deputy warden, health care [officials]" and the MDOC Director. Complaint, R.1, PageID.9. Mr. Miles-El explained that the prison's deliberate indifference to his allergies was interfering with his access to food and medicine, because "health care staff and inmates play with the dogs" and then touch Mr. Miles-El's food and medicine. Corr. Recs., R.1-5, PageID.26. Mr. Miles-El told staff generally that he was forced to "refuse [his] meds whenever the nurses are playing with dogs without washing their hands." Corr. Recs., R.1-

15, PageID.39. And he supported those general grievances with specific complaints. For instance, Mr. Miles-El told staff that on August 11, 2020, the nurse in charge of distributing medicine was touching dogs "without gloves or washing his hands before passing out meds," and as a result, Mr. Miles-El had to refuse his medicine. Corr. Recs., R.17-3, PageID.166.

In 2021, MDOC transferred Mr. Miles-El from Algers to Kinross Correctional Facility. Complaint, R.1, PageID.12. Once again, Mr. Miles-El was transferred to a housing unit where he would be in contact with dogs. *Id.* This time, Mr. Miles-El refused to enter his cell in protest, nearly resulting in punishment. *Id.*

The years-long degradation of Mr. Miles-El's physical health because of his exposure to dogs culminated in a mental health breakdown. Worn down by years of difficulty breathing and of severe asthma attacks, Mr. Miles-El had a mental health breakdown and had to be treated for severe depression and severe anxiety. Complaint, R.1, PageID.11.

## 2. Mr. Miles-El's severe asthma, and MDOC's failure to accommodate his disability, prevents him from accessing services, programs, and benefits.

As a result of his allergies and MDOC's refusal to accommodate his disability, Mr. Miles-El suffered significant harm. He regularly coughed up phlegm, had trouble breathing and had tightness in his chest, and developed rashes on his arms. Corr. Recs., R.1-7, PageID.30. And his access to all aspects of prison services and programming suffered. He could not access medical care, because staff would touch dogs and then handle medicine, and because "prisoner dog handlers bring [dogs] to medlines, and to Health Care with them." Corr. Recs., R.1-2, PageID.22; *see also* Corr. Recs., R.1-15, PageID.39.

Mr. Miles-El also could not attend religious services, could not exercise indoors or outdoors, or work at his job. Complaint, R.1, PageID.11. His use of the housing unit dayrooms, including computer kiosks, was also limited by his disability and MDOC's refusal to grant him an accommodation. Complaint, R.1, PageID.13; Corr. Recs., R.1-15, PageID.39. As he explained in a grievance to MDOC officials, "I have limited use in the dayrooms; kiosk machines or microwave or eating in unit chow hall when dog handlers also work in food service; when dog handlers bring their dogs around in day

rooms I leave to avoid allergic reactions that are potent triggers for my asthma attacks." Corr. Recs., R.1-15, PageID.39. In another grievance, he explained that his access to medication, food, and use of the dayrooms was limited because of the exposure to dogs and dog dander in each of those locations. Corr. Recs., R.1-2, PageID.22; *see also* Complaint, R.1, PageID.8. And he explained that his prison-issued clothes were mingled with clothes covered in dog hair, which resulted in "rashes and breaking out," and "allergic skin reactions" when he would wear his clothes. Miles Dep., R.34-3, PageID.356; *see also* Complaint, R.1, PageID.9.

### 3. MDOC officials were aware of, but failed to accommodate, Mr. Miles-El's disability.

MDOC officials were well aware of Mr. Miles-El's disability—and even though some MDOC officials recognized that transferring Mr. Miles-El would be a reasonable accommodation, MDOC refused to do so.

MDOC officials knew of Mr. Miles-El's disability because he submitted multiple grievances about his condition. *See supra* pp. 12-13. For instance, Mr. Miles-El explained that "[Officer] Pancheri knew that Miles-El had severe allergies to animals from his grievances." Miles Opp'n to SJ, R.41, PageID.429. And officials were also well aware of Mr. Miles-El's requested

accommodation: That MDOC house Mr. Miles-El in a housing unit where he wouldn't be exposed to dogs.

Mr. Miles-El was on strong ground in requesting that accommodation: MDOC officials regularly transfer prisoners who, like Mr. Miles-El don't have a "hold[]" (that is, a designation that restricts their transfer). Petersen Decl., R.34-7, PageID.377. MDOC officials have the authority to transfer prisoners, and transfers "happen[] all the time at every institution." Miles Opp'n to SJ, R.41, PageID.426. Even during the COVID-19 pandemic, Mr. Miles-El reported that MDOC was still "[t]ransferring individuals to other prisons for medical reasons." Corr. Recs., R.1-11, PageID.35. MDOC staff themselves explain that prisoners are "often transfer[red]" for "medical needs," or for other programming needs. Petersen Decl., R.34-7, PageID.377. These transfers are "common in MDOC facilities." Petersen Decl., R.34-7, PageID.378. And indeed, MDOC had previously recommended that Mr. Miles-El be transferred to a dog-free housing unit. In 2018, officers at Chippewa who had "witnessed [Mr. Miles-El's] respiratory and asthma problems" agreed that "the best solution would be for [Mr. Miles-El] to be moved to the East side" of Chippewa, because "the dogs should not be in the buildings on the

East side." Corr. Recs., R.1-2, PageID.22. But that didn't work, because Mr. Miles-El was still exposed to dogs on the East side. Corr. Recs., R.1-3, PageID.24.

Instead of removing Mr. Miles-El from the allergen, MDOC made Mr. Miles-El's condition worse. Mr. Miles-El told Officer Pancheri that, if he were transferred to Algers, he would suffer substantial harm because he would be exposed to dogs at Algers. Miles Opp'n to SJ, R.41, PageID.426. But Officer Pancheri told Mr. Miles-El that he "didn't care" about Mr. Miles-El's disability, and that once "the transfer coordinator approved the transfer, he (Miles-El) would be someone else's problem." Miles Opp'n to SJ, R.41, PageID.426. And indeed, Officer Pancheri and MDOC did transfer Mr. Miles-El into prisons and housing units where he continued to be exposed to dogs. *See supra* pp. 11-12. Those repeated transfers continued until Mr. Miles-El suffered a mental health breakdown. *See supra* p. 13.

While MDOC exacerbated Mr. Miles-El's illness by continuing his direct exposure to allergens, it also offered Mr. Miles-El ineffective temporary solutions for Mr. Miles-El's symptoms, without treating the underlying cause. First, it offered Mr. Miles-El a nebulizer, and then it canceled that

treatment. Corr. Recs., R.1-13, PageID.37. Officers changed dosages of some of Mr. Miles-El's medications, and ordered an inhaler. *Id.* But none of those changes helped Mr. Miles-El—and more importantly, they didn't treat the underlying cause of his severe symptoms. *Id.* Months after Mr. Miles-El was seen by health staff, he was still suffering from severe asthma. Corr. Recs., R.1-20, PageID.45.

### 4.   Mr. Miles-El files suit in the Western District of Michigan.

Mr. Miles-El, proceeding pro se, sued the State of Michigan, the Michigan Department of Corrections, the Bureau of Health Care Services, and various prison officers in their official capacity in the Western District of Michigan. He alleged two theories of violating the RA and the ADA: *First*, that the defendants failed to grant him a reasonable accommodation for his disability by failing to house him in a facility where he would not encounter dogs; and *second*, that the defendants intentionally discriminated against him because of his disability. Complaint, R.1, PageID.12-13.

The district court screened Mr. Miles-El's complaint, dismissing a subset of the claims and individual defendants in Mr. Miles-El's pro se complaint. The district court authorized service of Mr. Miles-El's claims

under the First Amendment, Eighth Amendment, the RA and ADA, and state law claims, including the Michigan Persons with Disabilities Civil Rights Act and Article 1 of the Michigan Constitution. Screening Op., R.9, PageID.91-92.

The defendants collectively moved for summary judgment based on Mr. Miles-El's failure to exhaust administrative remedies. Defs. First SJ Br., R.17, PageID.108-125. The magistrate judge issued a report recommending that the district court deny the motion, because there were genuine issues of material fact bearing on the availability of the grievance process, First R&R, R.23, PageID.273-298, which the district court adopted, First Op., R.24, PageID.299.

### 5. The district court grants summary judgment to the defendants.

The defendants moved for summary judgment on all claims. Defs. Second SJ Br., R.34, PageID.319-339.

The magistrate judge recommended granting summary judgment to the defendants. The judge held that the individual officers could not be deliberately indifferent because they "rel[ied] on the assessments made by medical staff." Second R&R, R.45, PageID.460. On the RA/ADA claims, the

judge recommended summary judgment for two reasons. *First*, because Mr. Miles-El did not meet his burden to show that he was denied prison services or programs, and *second*, because "allegations of inadequate medical treatment do not state a claim for relief under the ADA or RA." Second R&R, R.45, PageID.464. The judge recommended declining supplemental jurisdiction over the state law claims. Second R&R, R.45, PageID.465.

Mr. Miles-El objected to the report and recommendation. Miles-El Objection, R.46, PageID.466-485. In particular, Mr. Miles-El stressed that he had brought a "fail[ure] to grant … a reasonable accommodation" claim under the RA/ADA, which the magistrate judge failed to analyze, Miles-El Objection, R.46, PageID.482, but the district court adopted the report in its entirety Second Op., R.48, PageID.498-504. Mr. Miles-El filed a timely notice of appeal. NOA, R.50, PageID.506-507.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment, and all questions of statutory interpretation, de novo. *Public Interest Legal Foundation v. Benson*, 136 F.4th 613, 622 (6th Cir. 2025). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). "A dispute of a material fact is genuine so long as 'the

evidence is such that a reasonable jury could return a verdict for the non-

moving party.'" *Kirilenko-Ison v. Board of Education of Danville Independent*

*Schools*, 974 F.3d 652, 660 (6th Cir. 2020) (quoting *Jackson v. VHS Detroit Re-*

*ceiving Hospital, Inc.*, 814 F.3d 769, 775 (6th Cir. 2016)). The Court reviews

decisions on summary judgment by "view[ing] the factual evidence and

draw[ing] all reasonable inferences in favor of the non-moving party," *See v.*

*City of Elyria*, 502 F.3d 484, 491 (6th Cir. 2007), keeping in mind that "[p]ro se

plaintiffs enjoy the benefit of a liberal construction of their pleadings and

filings," *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999).

## SUMMARY OF ARGUMENT

The Court should reverse the grant of summary judgment to the state

entities on Mr. Miles-El's RA/ADA claims and to Officer Pancheri on the

Eighth Amendment claim. The record contained disputes of material fact on

those claims, and neither qualified immunity nor state sovereign immunity

bars the claims. And the Court should remand to allow the district court to

exercise supplemental jurisdiction over Mr. Miles-El's related state-law claims.

**I.** The summary judgment record established disputes of material fact on Mr. Miles-El's RA and ADA claims.

**A.** The RA and ADA establish two theories for plaintiffs to recover: A failure-to-accommodate claim and an intentional discrimination claim. The RA and ADA are both broad remedial statutes, and because they use similar language, courts interpret them coextensively with few exceptions not relevant here. Each statute requires a plaintiff to show that they have a qualifying disability, are qualified for a program or service, and were either denied a service or were subject to discrimination because of his disability. The third requirement gives rise to two different theories. A failure to reasonably accommodate a disability *is* disability discrimination, *Finley*, 102 F.4th at 820, so a plaintiff who meets the first two requirements and shows that the defendants failed to reasonably accommodate their disability has stated a valid claim under the RA/ADA. Separately, a plaintiff can meet the third requirement by showing that they were treated differently because of their disability, and they can make that showing with either direct or indirect

evidence. Claims using indirect evidence are analyzed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

**B.** Mr. Miles-El met his burden at summary judgment on both theories.

**1.** *First*, he showed that MDOC failed to reasonably accommodate his disability.

No party disputed that Mr. Miles-El has a disability—severe asthma—nor could they, because Mr. Miles-El experiences severe asthma attacks, fatigue, and difficulty breathing, which are all symptoms that limit "one or more major life activities," 42 U.S.C. § 12102(1)(A).

And, Mr. Miles-El was qualified for prison programs and services that he could not receive absent a reasonable accommodation. The phrase "services, programs, or activities," is extremely broad, encompassing "virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998). Here, the record showed that Mr. Miles-El's severe asthma, triggered by contact with dogs, impeded his ability to access medical care, wear clothing, eat food, and attend programming. Take medical care. Mr. Miles-El explained that nurses and prisoners who distribute

medicine would play with dogs before handing out pills, and that on several occasions Mr. Miles-El had to refuse his medicine because MDOC refused to house him away from dogs. And Mr. Miles-El explained that MDOC's commingling of his laundry with clothes that were covered with dog dander meant that he couldn't wear his clothes without breaking out into a rash.

Finally, Mr. Miles-El showed that MDOC could have, but didn't, reasonably accommodate his disability by transferring him to a facility without dogs. Indeed, MDOC officers themselves previously recognized that that would be "an acceptable solution," but they failed to follow through with it. And MDOC transferred prisoners with *other* ailments, but not with allergies.

**2.** *Second*, Mr. Miles-El showed that MDOC intentionally discriminated against him. He proffered indirect sufficient showing that MDOC treated him differently from similarly situated inmates. Mr. Miles-El showed that MDOC refused to transfer him, but that it did transfer prisoners for educational programming or for other reasons. That satisfies Mr. Miles-El's prima facie case under *McDonnell Douglas Corp.*, and the record contains no legitimate reason for MDOC's failure to accommodate Mr. Miles-El's disability. *See* 411 U.S. 792. That's sufficient to defeat summary judgment.

**C.** The district court's contrary reasoning was wrong.

The district court relied on two reasons to grant summary judgment on Mr. Miles-El's RA/ADA claims. *First*, because Mr. Miles-El did not show that he was denied the benefits of prison services, programs, or activities, and *second*, because Mr. Miles-El's RA/ADA claims amounted to allegations of inadequate medical care, which isn't actionable under the ADA or RA. Both reasons are wrong.

**1.** Mr. Miles-El did show that he was denied the benefits of services, programs, or activities. Those terms are extremely broad, and they encompass medical care, clothing, and programming. Mr. Miles-El couldn't access those services and programs without triggering his severe asthma. The district court declared, without analysis, that Mr. Miles-El failed to meet his burden, but the record shows otherwise.

**2.** The district court conflated Mr. Miles-El's failure-to-accommodate claim with an inadequate-medical-care claim that it believed not actionable under the RA/ADA. The district court cited cases declining to recognize an RA/ADA claim for substandard medical care. Those cases are inapposite: Mr. Miles-El argued that MDOC's failure to accommodate his disability

impedes his access to prison programs, services, and benefits, like food, pro-gramming, and clothing. All failure-to-accommodate claims could be recharacterized as inadequate treatment claims, so the district court's con-flation of the two theories would wipe failure-to-accommodate claims out of the ADA.

**II.** The summary judgment record establishes disputes of material fact about Mr. Miles-El's Eighth Amendment claims.

**A.** To prevail on an Eighth Amendment claim, a plaintiff must meet an objective prong (that the plaintiff faced a substantial risk of serious harm) and a subjective prong (that the prison official knew of, and disregarded that risk).

**B.** Mr. Miles-El proffered sufficient evidence to meet both prongs. He established that his severe asthma posed a substantial risk of serious harm to his health, and that exposure to dogs caused asthma attacks and other dangerous symptoms. And he established that Officer Pancheri knew of the risk that exposure to dogs caused Mr. Miles-El, and nevertheless kept Mr. Miles-El in a housing unit where he was exposed to dogs. Instead of

minimizing that exposure, he transferred Mr. Miles-El to another MDOC facility where he'd be housed with dogs.

**C.** The district court granted summary judgment to Officer Pancheri on the ground that Officer Pancheri had no authority to transfer Mr. Miles-El. But that material fact was clearly disputed; Mr. Miles-El submitted his own affidavit declaring that Officer Pancheri told Mr. Miles-El that he had that authority and an affidavit from another prisoner recounting a similar conversation. A jury should resolve that dispute.

**D.** Officer Pancheri isn't entitled to qualified immunity. This Court rarely finds qualified immunity in cases where a plaintiff proffers sufficient evidence of deliberate indifference. This isn't one of those rare cases. Supreme Court and Sixth Circuit precedent clearly establish that the failure to remove a prisoner from an environment that risks serious medical harm violates the Eighth Amendment. *See Hunt v. Reynolds*, 974 F.2d 734, 735-36 (6th Cir. 1992).

**III.** The Eleventh Amendment doesn't bar Mr. Miles-El's claims.

**A.** The Eleventh Amendment provides states sovereign immunity unless that immunity is waived. States waived sovereign immunity for RA

claims by accepting federal funding. 42 U.S.C. § 2000d-7. And Title II of the

ADA waives sovereign immunity for actions that are also constitutional vi-

olations, including violations of the Eighth Amendment.

**B.** Sovereign immunity doesn't bar Mr. Miles-El's RA claim, because

Michigan receives federal funding. *See Finley*, 102 F.4th at 819 n.13.

**C.** Sovereign immunity doesn't bar Mr. Miles-El's ADA claim either,

because that claim is based at least in part on constitutional violations —

namely, MDOC's violation of Mr. Miles-El Eighth Amendment rights. *See*

*Georgia*, 546 U.S. at 157-59.

**IV.** The district court declined to exercise supplemental jurisdiction

over Mr. Miles-El state law claims because it granted summary judgment to

the defendants on all federal claims. Because the Court should reverse the

grant of summary judgment, it should also direct the district court to exer-

cise supplemental jurisdiction over the state law claims.

## ARGUMENT

## I. The summary judgment record established disputes of material fact on Mr. Miles's RA and ADA claims.

The RA and ADA provide two distinct causes of actions for plaintiffs:

a failure-to-accommodate claim and an intentional discrimination claim. Mr.

Miles-El brought both claims: He argued that MDOC failed to accommodate his severe asthma by transferring him to a prison where he could access services without encountering dogs, and that MDOC intentionally discriminated against him by facilitating transfers of *other* prisoners but not him. At summary judgment, Mr. Miles-El supported those claims with evidence. The district court granted summary judgment to the defendants on both claims, but its reasoning is lacking. The district court mischaracterized Mr. Miles-El's RA/ADA claim as one about inadequate medical treatment, and it wrongly concluded that Mr. Miles-El failed to allege or prove that he was denied the benefits of prison services or programs. The court should reverse the denial of summary judgment on the RA/ADA claims.

### A. The RA and the ADA establish two theories for plaintiffs to recover—failure to accommodate and intentional discrimination.

#### 1. The RA and the ADA establish broad protections for prisoners with disabilities.

Congress enacted the Rehabilitation Act in 1973 to "proscribe discrimination against persons with disabilities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 599 (1999). Congress understood that disability discrimination was "most often the product, not of invidious animus, but rather of

thoughtlessness and indifference—of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985).

To provide a remedy for that benign neglect, Congress enacted Section 504 of the RA, requiring that no "otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Congress built on the RA in 1990, enacting the ADA to "remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). The ADA expands the RA's prohibitions beyond entities receiving federal funding, including private parties and the states. *See, e.g.*, 42 U.S.C. §§ 12111(2), 12131(1). Congress found that discrimination against individuals with disabilities was a "serious and pervasive social problem," particularly in public accommodations, institutionalization, and health services. *PGA Tour*, 532 U.S. at 675 (quoting 42 U.S.C. § 12101(a)(2)). Congress enacted a "broad mandate" with a "sweeping purpose." *Id.* at 675. To effectuate that sweeping purpose, the ADA "forbids

discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." *Id.* (footnotes omitted).

This case concerns Title II, which prohibits public entities from (1) excluding from participation or denying the benefits of any services, programs, or activities of the entity, any qualified person with a disability, or (2) discriminating against that person. 42 U.S.C. § 12132.

RA and ADA claims against state entities are nearly identical. The RA requires that a plaintiff prove that the defendant received federal funding and that his disability was the "sole reason" of the defendant's discriminatory behavior, while the ADA only requires the plaintiff to prove that his disability was the "but-for cause" of the discrimination. *Finley*, 102 F.4th at 823. Otherwise, the two statutes travel together; this brief refers to the claim as an "RA/ADA claim."

Both the RA and the ADA apply to prisons. The ADA prohibits discrimination by a "public entity"—language that "unmistakably includes State prisons and prisoners within its coverage." *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 209 (1998). State prisons "fall squarely

within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* at 210 (quoting 42 U.S.C. § 12131(1)(B)).

### 2. The RA and ADA provide two causes of action for plaintiffs.

To prevail under the RA or the ADA, a plaintiff must establish that he (1) has a qualifying disability, (2) is otherwise qualified for a program or service, and (3) was either denied a service or was subjected to discrimination because of his disability. *Finley*, 102 F.4th at 820. The third prong gives rise to two separate theories of claim.

*First*, the statutes define a disability as a "physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). The ADA Amendment Act of 2008 requires courts to interpret the term disability "in favor of broad coverage" and "without regard to the ameliorative effects of mitigating measures." *Id.* at § 12102(4)(A), (4)(E)(i). Whether a disability may be episodic in nature, or occur infrequently, is not relevant to determining whether it substantially limits a major life activity. *Id.* at § 12102(4)(D).

*Second*, a person is otherwise qualified if they meet "the essential eligibility requirements for the receipt of such services." 28 C.F.R. § 41.32(b). Whether a prisoner is otherwise qualified "must be decided case by case based on numerous factors, including but not limited to valid penal justifications for excluding a particular individual prisoner from a service, program, or activity." *Miller v. King*, 384 F.3d 1248, 1266 (11th Cir. 2004), *vacated and superseded*, 449 F.3d 1149 (11th Cir. 2006).

The phrase "'services, programs, or activities' encompasses virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) (quoting 42 U.S.C. § 12132). A service, program, or activity in prison includes "many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')." *Yeskey*, 524 U.S. at 210. Because the state manages all aspects of life in prison, basic functions—like "mobility, hygiene, medical care, and virtually all other prison programs" are "services, programs, or activities" under the RA/ADA. *Georgia*, 546 U.S. at 157.

Notably, a plaintiff who succeeds in accessing a prison service, program, or activity still has a valid RA/ADA claim if their access to the service, program, or activity was made "only through an excessive or painful effort." *Keller v. Chippewa County, Michigan Board of Commissioners*, 860 F. App'x 381, 387 (6th Cir. 2021); *see also Disabled in Action v. Board of Elections in City of New York*, 752 F.3d 189, 200 (2d Cir. 2014).

*Third*, the discrimination element gives rise to "two different theories: failure to reasonably accommodate and intentional discrimination." *Finley*, 102 F.4th at 820; *see also Roell v. Hamilton County, Ohio/Hamilton County Board of County Commissioners*, 870 F.3d 471, 488 (6th Cir. 2017).

> ### a. A plaintiff makes out a claim under the RA and ADA if the defendant fails to accommodate his disability.

To prevail under the failure-to-accommodate theory, a plaintiff must show "that the defendant reasonably could have accommodated his disability but refused to do so." *Finley*, 102 F.4th at 820. A plaintiff need not provide specific evidence of discriminatory intent. *Id.* That's because "failing to grant a reasonable accommodation is itself direct evidence of discrimination." *Id.* Thus, a defendant who fails to reasonably accommodate a disability has "subjected [the plaintiff] to discrimination" in violation of the RA and ADA,

42 U.S.C. § 12132, 29 U.S.C. § 794, as the Court explained in *Georgia*, 546 U.S. at 157: "[T]he alleged deliberate refusal of prison officials to accommodate [a prisoner's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs" violates Title II of the ADA. So assuming that the plaintiff satisfies the first two prongs of the test, a plaintiff who demonstrates that the defendants failed to reasonably accommodate his disability has made out a claim under the RA and ADA.

The RA and ADA require covered entities, like prisons, to make "reasonable modifications in policies, practices, or procedures" when such modifications are "necessary to avoid discrimination on the basis of disability." *Finley*, 102 F.4th at 821 (quoting 28 C.F.R. §§ 35.130(b)(7), 35.150(a)(3)). Covered entities need not grant an accommodation if they show that an accommodation would impose "undue financial and administrative burdens" or "fundamentally alter the nature" of their services or programs. *Id.* Both the undue burden and fundamental alteration arguments are affirmative defenses, and failure to raise either defense before the district court constitutes

forfeiture of that defense. *Childress v. Fox Associates, LLC*, 932 F.3d 1165, 1170-71 (8th Cir. 2019).

The question of whether an accommodation is reasonable is a question "specific to each case." *Finley*, 102 F.4th at 821. In general, under the RA and ADA, an accommodation is not reasonable if it would impose "undue financial and administrative burdens" or "fundamentally alter the nature" of their services or programs. 28 C.F.R. §§ 35.130(b)(7), 35.150(a)(3); *see also McPherson v. Michigan High School Athletic Ass'n*, 119 F.3d 453, 459-60, 463 (6th Cir. 1997) (en banc).

> **b.    A plaintiff makes out a claim under the RA and ADA if the defendant discriminates on the basis of disability.**

To prevail under the intentional discrimination theory, a plaintiff must show differential treatment on the basis of disability, *Tchankpa v. Ascena Retail Group, Inc.*, 951 F.3d 805, 818 (6th Cir. 2020), with either direct or indirect evidence, *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 453 (6th Cir. 2004).

Direct evidence in this context is evidence that the defendant relied on the disability in making the adverse decision. *Coulson v. Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 855 (6th Cir. 2002). (Recall that the failure-to-

accommodate theory is different, *see supra* pp. 32-34, because a claim that the defendant failed "to offer a reasonable accommodation necessarily involve[s] direct evidence (the failure to accommodate) of discrimination." *Kleiber v. Honda of America Manufacturing, Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)). Direct evidence means evidence that the defendant "relied on the plaintiff's disability" entirely (for the RA) or in part (for the ADA) in taking the challenged action. *Finley*, 102 F.4th at 823.

In RA and ADA cases, indirect evidence is evidence that requires an inference to conclude that the decisionmaker relied on the plaintiff's disability in taking the challenged action. *Id.* at 824. Claims involving indirect evidence proceed using the familiar burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must make out her prima facie case that "(1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability." *Bennett v. Hurley Medical Center*, 86 F.4th 314, 325 (6th Cir. 2023) (quoting *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015)). Second, the burden shifts to the defendant to proffer a "legitimate,

nondiscriminatory reasons for its actions." *Id.* (citation omitted). Third, the burden shifts back to the plaintiff to show that the proffered reason is pretext for unlawful discrimination. *Id.*

## B. The record contains disputes of material fact on both theories.

### 1. Mr. Miles-El met his burden to show that defendants failed to reasonably accommodate his disability.

To prevail on his reasonable accommodation theory, Mr. Miles-El needed to show that he has a disability, that he is otherwise qualified for the program or service, and that the defendant reasonably could have accommodated his disability but refused to do so. *See supra* pp. 34-35. Mr. Miles-El made all three of those showings.

**i.** *First*, Mr. Miles-El has a disability. He supplied evidence at summary judgment that he has "severe persistent" asthma that is aggravated by exposure to "animals," including dogs. *See supra* pp. 10-13. His symptoms include severe asthma attacks and chest congestion, fatigue, difficulty briefing, and coughing up phlegm. *See supra* pp. 10-13. As a result of his disability, and MDOC's failure to accommodate his disability, Mr. Miles-El's access to medical care, religious programming, prison dayrooms, computer kiosks, and the dining hall were all limited and compromised. *See supra* pp.

14-15. And Mr. Miles-El's evidence showed that his disability and MDOC's failure to accommodate him deterred him from accessing services and programs—limiting several "major life activities." 42 U.S.C. § 12102(1)(A).

Numerous courts agree that Mr. Miles-El's evidence satisfies the first prong of the ADA. Asthma is a recognized disability because it limits the "ability to breathe," which is a major life activity. *See Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242, 1251 (10th Cir. 2004). A disability that limits prisoners' access to programming also limits major life activities. *See, e.g.*, *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929, 954 (N.D. Cal. 2015); *Holmes v. Godinez*, 311 F.R.D. 177, 226 (N.D. Ill. 2015). And, this prong is satisfied when a prisoner shows that they are deterred from accessing programs and services because of the prison's failure to accommodate their disability. *See Wright v. New York State Department of Corrections*, 831 F.3d 64, 73 (2d Cir. 2016).

MDOC never contested that Mr. Miles-El had a disability, so they have forfeited any challenge here. *See, e.g.*, *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 545 (10th Cir. 2014). Nor could they contest that fact now, because

as explained above, Mr. Miles-El met his burden at summary judgment to show that his severe asthma substantially limits multiple life activities.

**ii.** *Second*, Mr. Miles-El was otherwise qualified for multiple programs and services that he could not receive absent a reasonable accommodation. Those services and programs include:

- *Medical care*: MDOC's failure to accommodate Mr. Miles-El's disability resulted in his inability to access medical care. Dogs were present at "medlines" where staff distribute medicine, so he had to refuse medication (pills handed out by prison staff) because staff would touch dogs in his housing unit before handing out the pills. *See supra* pp. 23-24. Medical care is a service. *Georgia*, 546 U.S. at 157.

- *Clothing*: Because MDOC refused to transfer him, Mr. Miles-El's clothes commingled with clothes worn by prisoners handling dogs, so he could not wear clothes without suffering a rash. *See supra* p. 15. Clothing is a service. *See Levesque v. Clinton County*, No. 9:10-CV-0787 (DNH/DEP), 2012 WL 6948779 (N.D.N.Y. Dec. 28, 2012) (R&R), adopted by 2013 WL 316770 (Jan. 28, 2013); *see also Furgess v.*

*Pennsylvania Department of Corrections*, 933 F.3d 285, 289-90 (3d Cir. 2019).

- *Food*: Mr. Miles-El's access to food was limited by MDOC's failure to accommodate his disability. He encountered dogs in the chow hall and where staff who had interacted with dogs served and cooked food, and in trying to use the prison microwave. *See supra* pp. 14-15. Food is a service. *See Douglas v. Muzzin*, No. 21-2801, 2022 WL 3088240 (6th Cir. Aug. 3, 2022); *Jaros v. Illinois Department of Corrections*, 684 F.3d 667 (7th Cir. 2012).

- *Programming*: MDOC's refusal to transfer Mr. Miles-El to a dog-free facility limited his access to programming, including schooling, religious programming, and computers. *See supra* pp. 14-15. Programming is a service. *Georgia*, 546 U.S. at 157.

Mr. Miles-El was qualified to receive medicine, access the computers, use the phone, go in the dayroom, and eat in the cafeteria. He wasn't subject to any disciplinary measures or restrictions that prohibited him from accessing those services. *Contra Alphonsis v. Garnica*, No. 21-56141, 2022 WL 7842130, at *1 (9th Cir. Oct. 14, 2022). But for a reasonable accommodation,

Mr. Miles-El would have been able to access those services, programs, and activities.

Again, MDOC never contested that Mr. Miles-El was otherwise qualified for the services he could not access, so they have forfeited any challenge to Mr. Miles-El's eligibility. *See, e.g.*, *Smothers*, 740 F.3d at 545. Nor would that argument be persuasive.

**iii.** *Third*, Mr. Miles-El showed (and MDOC never disputed) that MDOC reasonably could have accommodated his disability by transferring Mr. Miles-El, but they refused to do so. MDOC officers themselves agreed that transferring Mr. Miles-El would be a reasonable accommodation. In 2018, separate MDOC officers agreed that it "would be an acceptable solution to Miles' allergies" to transfer him to a housing unit without dogs, and that the "best solution" to "alleviate [his] dog dander problems" would be to transfer Mr. Miles-El to be away from dogs, and indeed, MDOC previously transfer him because of his allergies. *See supra* pp. 16-17. And, the undisputed record showed that MDOC transferred *other* prisoners—including during the pandemic—to accommodate their disabilities. *See supra* p. 16.

Transfers away from disability-triggering allergies are a well-recognized reasonable accommodation. *See, e.g.*, *Eustace v. Springfield Public Schools*, 463 F. Supp. 3d 87, 94 (D. Mass. 2020). Indeed, employers have a "statutory duty to consider transfer as a reasonable accommodation" for a plaintiff with an allergy. *EEOC v. United Parcel Service, Inc.*, 249 F.3d 557, 563 (6th Cir. 2001); *see also Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998).

Transfers are also reasonable accommodations in the prison context. *See, e.g.*, *Finley*, 102 F.4th at 821; *Jones v. Centurion*, No. 1:22-CV-00024, 2022 WL 9495987, at *7 (M.D. Tenn. Oct. 14, 2022); *Lonergan v. Florida Department of Corrections*, 623 F. App'x 990, 993-94 (11th Cir. 2015) (citing *Miler v. King*, 384 F.3d 1248, 1266 n.21 (11th Cir. 2004)); *Burton v. McDonald*, No. 2:11-CV-2187 KJN P, 2012 WL 2912432, at *9 (E.D. Cal. July 16, 2012) (citing *Purcell v. Pennsylvania Department of Corrections*, 2006 WL 891449, at *16 (W.D. Pa. 2006)); *Golden v. Illinois Department of Corrections*, No. 12-CV-7743, 2016 WL 5373056, at *4 (N.D. Ill. Sept. 26, 2016); *Warren v. Vincent*, No. 08-250, 2012 WL 566650, at *4 (W.D. Pa. Feb. 21, 2012).

In any event, MDOC never argued that Mr. Miles-El's requested accommodation—a transfer to a housing unit or prison where he wouldn't encounter dogs—was unreasonable, so they have forfeited those arguments here. And they have forfeited any affirmative defense that the requested accommodation would be unduly burdensome or would fundamentally alter the nature of their services. *See supra* pp. 35-36.

> **2.** **Mr. Miles-El met his burden to show that defendants intentionally discriminated against him because of his disability.**

Separate from his failure to accommodate theory, Mr. Miles-El also met his summary judgment burden, with direct and indirect evidence, on his intentional discrimination claim.

To defeat summary judgment on an intentional discrimination claim, a plaintiff must "show unfavorable treatment on the basis of his disability" through either direct or indirect evidence. *See supra* pp. 37-38. These claims proceed under *McDonnell Douglas Corp. See supra* pp. 37-38.

Mr. Miles-El met his *prima facie* burden. Mr. Miles-El showed that he suffered a disability and that he was otherwise qualified for programs or services from the discriminating entity. *See supra* pp. 38-42. As to the third

factor, Mr. Miles-El alleged that defendants treated him "differently from similarly situated inmates, in the terms and conditions of special accommodation requests" because of his disability. Complaint, R.1, PageID.13. MDOC refused to transfer Mr. Miles-El to a dog-free facility, even though Mr. Miles-El showed that MDOC transferred *other* prisoners at the same time Mr. Miles-El sought a transfer. Corr. Recs., R.1-11, PageID.35. And in his deposition, he reiterated that MDOC had transferred prisoners for educational programming, and for *other* medical reasons, but that they refused to transfer him. Miles Dep., R.34-3, PageID.355.

MDOC never suggested a legitimate reason for its failure to transfer Mr. Miles-El. Nor did MDOC contest that it *did* transfer prisoners with other medical needs, or for educational programming. MDOC failed to meet its burden at the second step, so summary judgment was inappropriate. *See Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1185 (6th Cir. 1996).

### C. The district court's contrary reasoning was wrong.

In adopting the Magistrate Judge's R&R, the district court granted summary judgment to defendants on Mr. Miles-El's failure-to-accommodate theory for two reasons. *First*, because Mr. Miles-El "has not provided

allegations much less evidence that he was denied the benefits of prison services or programs." Second R&R, R.45, PageID.464. *Second*, because "allegations of inadequate medical care [are] not actionable under the ADA or RA." *Id.* Both reasons are wrong.

### a. Mr. Miles-El alleged, and proffered evidence, that he was denied several services and programs.

Mr. Miles-El alleged, and met his burden at summary judgment, to show that he was denied the benefits of prison services and programs. The Supreme Court has repeatedly made clear that services, programs, or activities is expansive in the prison context, including recreational, medical, educational, vocational, and "virtually all other prison programs." *Georgia*, 546 U.S. at 157; *see also Yeskey*, 524 U.S. at 210. Mr. Miles-El alleged, and supplied undisputed evidence that he was denied the benefits of several different categories of programs, benefits, or services. *See supra* pp. 40-42. Mr. Miles-El was denied access to medical care, clothing, food, and programming in the prison, because MDOC would not accommodate his disability. *See supra* pp. 42-44. Any dispute of material fact as to the denial of the benefits of those programs is sufficient for Mr. Miles-El to prevail at this stage.

### b. The district court wrongly analyzed Mr. Miles-El's claims.

The district court misunderstood Mr. Miles-El's RA/ADA claims, and its legal analysis is wrong in any event.

The district court evidently viewed Mr. Miles-El's claims about his inability to access medical care as an allegation that he was denied medical treatment *for his disability* (here, severe asthma). Second R&R, R.45, PageID.463. In granting summary judgment to the defendants, the district court cited cases where the plaintiff claimed that the prison's failure to adequately treat his disability violated the RA/ADA. In *Stevenson v. Pramstaller*, No. 2:08-CV-79, 2009 WL 1883878, at *3 (W.D. Mich. June 30, 2009), the plaintiff claimed "that he is not being treated for Hepatitis because he has Hepatitis." The same goes for the district court's other cases. *See Chapman v. Franklin County Sheriff*, 2:22-CV-2524, 2022 WL 3359283 (S.D. Ohio Aug. 15, 2022); *Butler v. Scholten*, 1:19-CV-449, 2019 WL 4126470 (W.D. Mich. Aug. 30, 2019). Those cases are inapposite: Unlike those plaintiffs, who alleged that the failure to treat their disability was *by itself* an exclusion from a service, program, or activity, Mr. Miles-El argued that the failure to treat his

disability caused his exclusion from *other* services, programs, and activities. *See supra* pp. 40-42.

Courts of appeals regularly reverse district courts that make this same analytical error, conflating a (supposedly illegitimate) denial-of-medical-treatment claim with a (legitimate) failure-to-accommodate claim. For instance, in *Furgess v. Pennsylvania Department of Corrections*, 933 F.3d 285, the Third Circuit reversed the dismissal of an RA/ADA claim brought by a prisoner with leg braces who alleged that he could not safely enter or exit a prison shower. The court explained that "complaints about not being provided an accessible shower are not allegations of medical malpractice or disagreements about medical treatment. They are requests for reasonable accommodations so that inmates with disabilities can take a shower—just like able-bodied inmates." *Id.* at 291; *see also Brown*, 81 F.4th at 709; *Munoz v. California Department of Corrections and Rehabilitation*, 842 F. App'x 59, 62 (9th Cir. 2021); *Ingram v. Clements*, 705 F. App'x 721, 725-26 (10th Cir. 2017).

So too here: Mr. Miles-El's request for a transfer to a dog-free facility does not "treat" his severe asthma; it is an accommodation that allows him to partake in the daily activities of prison life without suffering asthma

attacks. A transfer to a dog-free facility is no more medical treatment or less an accommodation than the installation of a wheelchair ramp or handrails in a shower, to allow people with disabilities to access those services. The district court's conflation of the failure-to-accommodate theory with a claim about poor medical care would write the well-recognized failure-to-accommodate claim out of the RA and ADA. *All* failure-to-accommodate claims could be repackaged as allegations of inadequate medical treatment. But the RA and ADA unambiguously recognize failure-to-accommodate claims. *See supra* pp. 34-36.

## II. The summary judgment record established disputes of material fact on Mr. Miles-El's Eighth Amendment claims.

The summary judgment record contained disputes of material fact as to Mr. Miles-El's Eighth Amendment claim against Officer Pancheri. Mr. Miles-El put forward evidence satisfying the objective prong of the Eighth Amendment by showing that his severe asthma caused difficulty breathing, wheezing, and fevers. And he satisfied the subjective prong by showing that he filed grievances with Officer Pancheri, and that Officer Pancheri refused to transfer Mr. Miles-El away from the dogs. Even worse, Officer Pancheri actively transferred Mr. Miles-El to another MDOC facility where he would

live in a housing unit with dogs. The district court granted summary judgment to Officer Pancheri because it concluded (wrongly) that Officer Pancheri consulted medical staff—but there's no evidence of that in the record. For its part, the magistrate judge concluded that there was no dispute of material fact about whether Officer Pancheri was responsible for transferring Mr. Miles-El from Chippewa to Algers, but that point was vigorously disputed. Either way, the district court should not have granted summary judgment to Officer Pancheri, and the issue must be resolved by a jury.

## A. The Eighth Amendment's prohibition against cruel and unusual punishment includes an objective and subjective component.

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. It is bedrock law that a prison official's deliberate indifference to conditions posing a substantial risk to a prisoner's health and safety violates the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

A prison official is deliberately indifferent if (1) the prisoner's incarceration posed a substantial risk of serious harm; and (2) the official knew of, and disregarded, that risk. *Id.* at 834, 837. Those two factors are known as an

objective component and a subjective component, respectively. *See Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020).

The subjective prong requires a plaintiff at summary judgment to establish triable issues of fact that the defendants "(1) knew about facts from which they could infer that a substantial risk existed, (2) drew that inference, and (3) disregarded the risk." *Finley*, 102 F.4th at 805. The evidence need not show that defendants "knew with certainty" that harm would result; a plaintiff need only introduce evidence that the defendants "knew of a substantial risk that harm . . . [is] 'likely' to result." *Id.* at 807.

A plaintiff satisfies the subjective prong when he shows that a prison officer is aware that substantial harm might result from transferring a prisoner, but he authorizes the transfer anyway. For instance, in *Luna v. Davis*, 59 F.4th 713, 718-19 (5th Cir. 2023), the Fifth Circuit reversed the grant of summary judgment to prison officers who were aware that transferring the prisoner from one facility to another might result in bodily harm, but nonetheless authorized the transfer. In such a case, an officer disregards the risk to a prisoner's health by transferring them to a facility where their health may be compromised.

**B.    Mr. Miles-El met his burden at summary judgment.**

Mr. Miles-El alleged, and demonstrated, that his incarceration in proximity to dogs posed a substantial risk of serious harm to his health, and that Officer Pancheri knew of, and disregarded, that risk.

Start with the objective component. Mr. Miles-El established that his medical needs were sufficiently serious—meaning a condition that "has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (emphasis added) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004)).

Mr. Miles-El's severe asthma satisfies that component under either path. First, he has been diagnosed by healthcare providers with severe persistent asthma. *See supra* p. 10. Second, his severe asthma is so obvious that even a lay person would recognize it as needing attention—it causes Mr. Miles-El to have difficulty breathing, to wheeze, and to spike a fever. *See supra* pp. 10-13. Not surprisingly, the officers never challenged Mr. Miles-El's severe asthma as insufficient under the objective component, and this

Court has recognized that "asthma satisfies the 'objective' requirement of [a] deliberate indifference claim" because "the symptoms associated with an asthma attack—wheezing, difficulty breathing, tightness in the chest—are quite obvious and recognizable even to a lay person." *Harrison*, 539 F.3d at 518-19.

Mr. Miles-El also satisfied the subjective component as to Officer Pancheri. Mr. Miles-El explained that Officer Pancheri was aware of Mr. Miles-El's asthma because of the grievances that he filed, *see* Corr. Recs., R.1-2, PageID.22; Corr. Recs., R.1-3, PageID.23, and because Officer Pancheri observed Mr. Miles-El's symptoms in his housing unit at Chippewa, Miles-El Opp'n to SJ, R.36, PageID.392. Officer Pancheri told Mr. Miles-El that he "did not care" that transferring Mr. Miles-El would cause him injury, and that Mr. Miles-El could "complain and deal with" his asthma at his new facility. Complaint, R.1, PageID.8. Mr. Miles-El showed that Officer Pancheri had authority both to "initiate[]" transfers from Chippewa, and to prevent transfers from taking place. Miles-El Opp'n to SJ, R.36, PageID.392-393. Mr. Miles-El also provided evidence—an affidavit from Loren Sloush, who recounted that Officer Pancheri "called the transfer coordinator and told her to transfer

Miles-El to [Alger]," where Mr. Miles-El would be exposed to dogs. Miles-El Opp'n to SJ, R.36, PageID.388. Officer Pancheri was aware of Mr. Miles-El's disability, he failed to take any reasonable measures to alleviate the harm to Mr. Miles-El, and he told Mr. Miles-El he "did not care" about injuries to Mr. Miles-El. That is sufficient to meet Mr. Miles-El's burden as to Officer Pancheri. *See supra* p. 51.

### C. The district court erred in granting summary judgment to Officer Pancheri.

The district court granted summary judgment to Officer Pancheri on the ground that he "sought the advice of prison medical staff" in transferring Mr. Miles-El. Second Op., R.48, PageID.502. That's plain wrong. Nothing in the record supports that claim, and defendants never contended that Officer Pancheri consulted medical staff in dealing with Mr. Miles-El. The district court likely grouped Officer Pancheri with two other individual defendants at different MDOC facilities who did consult healthcare officials, but who aren't at issue in this appeal.

To the extent the district court adopted the magistrate judge's reasoning, that too doesn't warrant summary judgment. The magistrate judge recommended granting summary judgment on Mr. Miles-El's Eighth

Amendment claim to Officer Pancheri for one reason: Because "Pancheri had no authority to transfer Miles or to assign him to [Algers]." Second R&R, R.45, PageID.460. Here, the magistrate judge relied on an affidavit supplied by Officer Pancheri where he declared that he "did not have the authority to transfer prisoners," nor did he "have the authority to determine where the MDOC would transfer a prisoner." Pancheri Decl., R.34-4, PageID.366.

But Mr. Miles-El vigorously contested whether Officer Pancheri had the authority to transfer him, declaring in an affidavit that Officer Pancheri told Mr. Miles-El that he would transfer him to Algers. And Mr. Miles-El provided a sworn declaration from another prisoner, who recounted a specific conversation with Officer Pancheri in January 2020, where "Pancheri expressed to [him] and the unit officers that … [Officer Pancheri] would get [Miles-El] transferred" to another facility. Miles-El Opp'n to SJ, R.36, PageID.388. That witness further recounted another conversation where Officer Pancheri told him "directly that [Pancheri] called the transfer coordinator and told her to transfer Miles-El to [Algers]." *Id.*

Mr. Miles-El thus established a clear dispute of material fact about Officer Pancheri's transfer authority. Notably, too, even if taken as true, Officer

Pancheri's declaration doesn't deny that he caused Mr. Miles-El to be transferred, or that he initiated a transfer. He only declares that he lacked "authority" himself to order a transfer—not that he was powerless to recommend a transfer. A reasonable jury could believe that Officer Pancheri did have the authority, or at the very least the influence, to have Mr. Miles-El transferred to a prison where he would be exposed to dogs, and that in so doing, Officer Pancheri was deliberately indifferent to Mr. Miles-El's health and safety.

### D. Officer Pancheri isn't entitled to qualified immunity.

Officer Pancheri asserted qualified immunity at summary judgment, Defs. Second SJ Br., R.34, PageID.328, but the district court didn't reach the issue. Nevertheless, this Court should hold that Officer Pancheri isn't entitled to qualified immunity for violating the Eighth Amendment.

A plaintiff can defeat qualified immunity if they point to existing law that places "an official's conduct 'beyond debate' such that any reasonable official would understand that her conduct was unlawful." *Finley*, 102 F.4th at 808. In the Eighth Amendment context, there are "very few Sixth Circuit cases [that] have held that a plaintiff satisfied the deliberate-indifference

standard but granted qualified immunity on 'clearly established' grounds." *Finley*, 102 F.4th at 809. That rare result is appropriate if officers are only vaguely aware of the need for medical care, but choose not to act. For instance, if the plaintiff was acting erratically, demonstrating the need for some treatment—but not so erratically that the need for urgent treatment was obvious. *See, e.g., Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 993 (6th Cir. 2017).

This is not one of those rare cases. To defeat qualified immunity, Mr. Miles-El must point to precedent clearly establishing that the Eighth Amendment barred maintaining or transferring a prisoner to an environment that the officer knew would be detrimental to the prisoner's health. *See Rhodes v. Michigan*, 10 F.4th 665, 679 (6th Cir. 2021). That precedent need not be "on all fours" with this case: Qualified immunity in the Eighth Amendment context operates at a high degree of generality. *Finley*, 102 F.4th at 808.

Binding precedent clearly establishes that failing to transfer a prisoner away from physical harm violates the Eighth Amendment. *Farmer v. Brennan* clearly establishes that exposing prisoners to a "substantial risk of serious harm" violates the Eighth Amendment. 511 U.S. at 834. And the "proposition

that deliberate indifference to a prisoner's medical needs can amount to a constitutional violation has been well-settled since *Estelle* [*v. Gamble*, 429 U.S. 97] in 1976." *Darrah v. Krisher*, 865 F.3d 361, 374 (6th Cir. 2017). The knowing refusal to provide a prisoner with needed treatment has been a clearly established violation of the Eighth Amendment since *Estelle*. *Id.* Indeed, *Estelle* itself cited as an example of deliberate indifference the knowing exposure of a prisoner to an allergen. *See Estelle*, 429 U.S. at 104 n.10. And the Court held that knowingly exposing prisoners to environmental harms is deliberate indifference. *Helling v. McKinney*, 509 U.S. 25, 28 (1993).

Applying those cases, this Court has concluded that officers violate the Eighth Amendment when they fail to transfer a prisoner away from a housing unit with environmental conditions that affects their health. *See Hunt v. Reynolds*, 974 F.2d 734, 735-36 (6th Cir. 1992). In *Hunt*, this Court aligned itself with "every circuit to address the issue" in concluding that the failure to transfer a prisoner with a serious medical need away from a smoke-free environment. *Id.* at 736. Thus, this Court has held that the failure to approve a cell change to move a prisoner away from a hazardous environment can constitute deliberate indifference. *Talal v. White*, 403 F.3d 423, 428 (6th Cir. 2005).

*Hunt* clearly, and specifically, establishes that Officer Pancheri's failure to transfer Mr. Miles-El to a dog-free housing unit, and his transfer of Mr. Miles-El to another facility where he would encounter dogs—was an Eighth Amendment violation. And it is undisputed that Officer Pancheri knew of the harm that keeping Mr. Miles-El in proximity to dogs would cause. *See supra* pp. 53-54. At a broader level, Officer Pancheri's deliberate difference to Mr. Miles-El's severe asthma and his failure to provide needed treatment violated clearly established law, from *Estelle*, *Helling*, and *Farmer*, that deliberate indifference to medical issues violates the Eighth Amendment.

## III.   The Eleventh Amendment does not bar Mr. Miles-El's claims.

The Eleventh Amendment protects states from suits for damages unless Congress abrogates sovereign immunity in a statute. Both the RA and the ADA abrogate sovereign immunity for Mr. Miles-El's claims. The RA does so explicitly, because Michigan accepts federal funding as this Court recognized in *Finley*, 102 F.4th at 819 n.13, and the ADA does so too for ADA claims that sound in constitutional violations, *see Georgia*, 546 U.S. at 157-59.

Mr. Miles-El's ADA claim concerns conduct that also violates the Eighth Amendment, so the ADA abrogates sovereign immunity for that claim, too.

### A. Sovereign immunity doesn't bar any claims under the RA and it doesn't bar ADA claims that sound in constitutional violations.

The Eleventh Amendment bars actions "against states unless they consent to be sued or Congress, pursuant to a valid exercise of its power, unequivocally expresses its intent to abrogate sovereign immunity." *Ashford v. University of Michigan*, 89 F.4th 960, 969 (6th Cir. 2024) (citations omitted). That bar also applies to "state officers acting in their official capacity" and "entities acting on behalf of the state." *Id.*

Two waivers of state sovereign immunity are relevant here.

*First*, sovereign immunity is inapplicable to claims brought under the Rehabilitation Act, because states that receive federal funds "waive their sovereign immunity defense to claims brought against them under the Rehabilitation Act." *Gean v. Hattaway*, 330 F.3d 758, 775 (6th Cir. 2003) (citing 42 U.S.C. § 2000d-7).

*Second*, sovereign immunity is inapplicable to claims brought under Title II of the ADA if those claims are based at least in part on

unconstitutional conduct. The ADA provides: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202 (footnote omitted). That provision abrogates sovereign immunity for conduct based in part on constitutional violations, including violations of the Eighth Amendment. *Finley*, 102 F.4th at 819 n.13 (citing *Georgia*, 546 U.S. at 157-59). That's because Section 5 of the Fourteenth Amendment grants Congress the power to "enforce … the provisions" of that Amendment. *Georgia*, 546 U.S. at 157-59. So Congress validly waived sovereign immunity for ADA claims against states for money damages that are "based, at least in large part, on conduct that independently violated" the Eighth Amendment. 546 U.S. at 157; *see also Finley*, 102 F.4th at 819 n.13; *McDaniel v. Syed*, 115 F.4th 805, 821 (7th Cir. 2024).

Thus, when a prisoner properly raises an Eighth Amendment deliberate indifference claim, his "parallel claims for money damages against the State under Title II" are not barred by sovereign immunity. *Durham v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023); *see also Valentine v. Collier*, 993 F.3d 270, 280-

81 (5th Cir. 2021); *Dinkins v. Correctional Medical Services*, 743 F.3d 633, 635 (8th Cir. 2014).

If the ADA claims aren't based in part on constitutional violations, the Court nevertheless must investigate whether "Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Georgia*, 546 U.S. at 159. Abrogation is valid if Congress unequivocally expressed its intent to abrogate immunity, and if Congress did so pursuant to a valid grant of constitutional authority. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). Section 5 of the Fourteenth Amendment provides a valid grant of authority if the legislation enacted is congruent and proportional to the pattern of violations the legislation is designed to remedy and prevent. *City of Boerne v. Flores*, 521 U.S. 507, 522-30 (1997). For instance, in *Lane*, the Court held that in enacting Title II of the ADA, Congress validly abrogated sovereign immunity for ADA claims that implicated the accessibility of judicial services, reasoning that in enacting Title II, Congress sought to enforce the Fourteenth Amendment's "prohibition on irrational disability discrimination." 541 U.S. at 510. *Lane* addressed disabled persons' access to courtrooms, concluding that access implicated the Due Process Clause and

the Confrontation Clause and that Title II's modest requirement for a "reasonable accommodation" was proportional to the need to ensure "the right of access to the courts." *Id.* at 532, 537.

### B. Michigan waived sovereign immunity for RA claims when it accepted federal funds.

Michigan receives federal funds, so it has waived its sovereign immunity defense to Mr. Miles-El's Rehabilitation Act claim. *Finley*, 102 F.4th at 819 n.13; *McKenzie v. Department of Corrections*, 957 N.W.2d 341, 351 (Mich. Ct. App. 2020), *appeal denied*, 981 N.W.2d 353 (Mich. 2022).

### C. Sovereign immunity doesn't bar Mr. Miles's ADA claims.

Sovereign immunity doesn't bar ADA claims that independently violate the Eighth Amendment. *See supra* pp. 60-61. Mr. Miles-El carried his burden to show disputes of material fact on his ADA claim and on his Eighth Amendment claim. *See supra* pp. 28-56. Because Mr. Miles-El's related Eighth Amendment and ADA claims should proceed to trial, sovereign immunity does not bar Mr. Miles-El's ADA claim. *See, e.g., Durham*, 82 F.4th at 229.

If the Court disagrees that Mr. Miles-El's carried his burden under the Eighth Amendment, it should nevertheless find sovereign immunity abrogated for the ADA claim because Congress intended to do so here, and acted

pursuant to valid constitutional authority. Congress intended to abrogate sovereign immunity in Title II, *see Lane*, 541 U.S. at 518, and it had constitutional authority to do so under Section 5 of the Fourteenth Amendment for claims brought by prisoners, because Title II's requirements are congruent and proportional to the severe and pervasive violations of disability discrimination in prisons—violations that implicate constitutional rights to access the courts, practice religion, and to be free from cruel and unusual punishment.

## IV. The Court should reverse the district court's decision not to exercise supplemental jurisdiction over Mr. Miles-El's state-law claims.

The district court declined to exercise supplemental jurisdiction over Mr. Miles-El's state law claims under the Michigan constitution and Michigan's Persons with Disabilities Civil Rights Act. Second R&R, R.45, PageID.464-465; Second Op., R.48, PageID.503-504. The district court reasoned that because "all federal claims [we]re dismissed before trial," the court would decline supplemental jurisdiction over the state law claims. Second Op., R.48, PageID.503. Because this Court should reverse the dismissal of Mr. Miles-El's RA/ADA and Eighth Amendment claims, *see supra* pp. 28-

56, the district court needs to consider supplemental jurisdiction again on remand, *see, e.g., Stein v. HHGREGG, Inc.*, 873 F.3d 523, 538 (6th Cir. 2017).

## CONCLUSION

The Court should reverse the district court's grant of summary judgment and remand for trial on Mr. Miles-El's claims under the Rehabilitation Act and the ADA, and against Officer Pancheri under the Eighth Amendment.

Dated: August 5, 2025

Respectfully submitted,

*/s/ Steven Marcus*

Shay Dvoretzky
Parker Rider-Longmaid
Steven Marcus
  *Counsel of Record*
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Samuel Weiss
RIGHTS BEHIND BARS
1800 M. St. NW
Fnt. 1 Suite 33921
Washington, DC 20033

1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
steven.marcus@skadden.com

*Counsel for Plaintiff-Appellant Kushawn S. Miles-El*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, as calculated by Microsoft Word, it contains 12,192 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(b)(1). I also certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) and Circuit Rule 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: August 5, 2025

Respectfully submitted,

*/s/ Steven Marcus*
Steven Marcus
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
steven.marcus@skadden.com

*Counsel for Plaintiff-Appellant Kushawn S. Miles-El*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2025, I electronically filed this brief and addendum with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: August 5, 2025　　　　　　Respectfully submitted,

*/s/ Steven Marcus*
Steven Marcus
SKADDEN, ARPS, SLATE,
　MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
steven.marcus@skadden.com

*Counsel for Plaintiff-Appellant Kushawn S. Miles-El*

# ADDENDUM

## Appellant's Designation of Relevant District Court Documents

U.S. District Court for the Western District of Michigan, Case No. 2:23-cv-00031

| Record Entry | Description of Document | Page ID# |
|:---:|:---:|:---:|
| 1 | Complaint | 1-20 |
| 1-2 | Appendix 2: Grievance Response Supplemental Form ("Corr. Recs.") | 22 |
| 1-3 | Appendix 3: Step III Grievance Decision ("Corr. Recs.") | 23-24 |
| 1-5 | Appendix 5: Grievance Form ("Corr. Recs.") | 26-27 |
| 1-7 | Appendix 7: Health Care Request ("Corr. Recs.") | 30 |
| 1-11 | Appendix 11: Letter to Humanity for Prisoners ("Corr. Recs.") | 35 |
| 1-13 | Appendix 13: Letter to Kushawn Miles ("Corr. Recs.") | 37 |
| 1-15 | Appendix 15: Reasonable Accommodation Request Form ("Corr. Recs.") | 39 |
| 1-20 | Appendix 20: Step II Grievance Appeal Form ("Corr. Recs.") | 45-46 |
| 9 | Screening Opinion ("Screening Op.") | 72-92 |
| 17 | Defendants' First Brief in Support of Motion for Summary Judgment ("Defs. First SJ Br.") | 108-125 |
| 17-3 | Exhibit 2: Grievance Form ("Corr. Recs.") | 160 |
| 23 | First Report and Recommendation ("First R&R") | 273-298 |
| 24 | Order Approving and Adopting Report and Recommendation ("First Op.") | 299 |
| 34 | Brief in Support of Motion for Summary Judgment ("Defs. Second SJ Br.") | 319-339 |

| Record Entry | Description of Document | Page ID# |
|:---:|:---:|:---:|
| 34-3 | Exhibit B: Miles Deposition Excerpts ("Miles Dep.") | 345-363 |
| 34-4 | Exhibit C: Pancheri Declaration ("Pancheri Decl.") | 364-366 |
| 34-7 | Exhibit F: Petersen Declaration ("Petersen Decl.") | 375-379 |
| 36 | Plaintiff's Affidavit and Objection to Defendants' Motion for Summary Judgment ("Miles-El Opp'n to SJ) | 387-399 |
| 41 | Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ("Miles Opp'n to SJ") | 424-436 |
| 45 | Second Report and Recommendation ("Second R&R") | 446-465 |
| 46 | Plaintiff's Objection to Report and Recommendation ("Miles-El Objection") | 466-485 |
| 48 | Opinion and Order Approving and Adopting Report and Recommendation ("Second Op.") | 498-504 |
| 50 | Notice of Appeal ("NOA") | 506-507 |